UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DEMARCUS DELVONN REED,

          Petitioner,

v.

THOMAS MACKIE,

          Respondent.

_____/

Case No. 1:16-cv-1202

Honorable Gordon J. Quist

**<u>REPORT AND RECOMMENDATION</u>**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner DeMarcus Delvonn Reed is incarcerated with the Michigan Department of Corrections at the Earnest C. Brooks Correctional Facility, (LRF) in Muskegon County, Michigan. On June 16, 2014, a jury of the Saginaw County Circuit Court found Petitioner guilty of first-degree home invasion, Mich. Comp. Laws § 750.110a; two counts of unlawful imprisonment, Mich. Comp. Laws § 750.349b; two counts of armed robbery, Mich. Comp. Laws § 750.529; second-degree criminal sexual conduct (CSC II), Mich. Comp. Laws § 750.520c; three counts of first-degree criminal sexual conduct (CSC I), Mich. Comp. Laws § 750.520b; two counts of felonious assault, Mich. Comp. Laws § 750.82; resisting or obstructing a police officer, Mich. Comp. Laws § 750.81d; and 11 counts of second-offense possession of a firearm during commission of a felony (felony-firearm), Mich. Comp. Laws § 750.227b.

On July 31, 2014, the court imposed sentences of 300 to 600 months' imprisonment for his home invasion convictions, 180 to 360 months' imprisonment for his unlawful imprisonment convictions, 600 to 900 months' imprisonment for his armed robbery convictions,

300 to 600 months' imprisonment for his CSC II conviction, 600 to 900 months' imprisonment for his CSC I convictions, 48 to 180 months' imprisonment for his felonious assault convictions, 46 to 180 months' imprisonment for his resisting arrest conviction, and a consecutive term of 60 months' imprisonment for his felony-firearm convictions.

Petitioner appealed his conviction to the Michigan Court of Appeals, which affirmed the judgment of the circuit court. *People v. Reed*, No. 323234, 2015 WL 8278760 (Mich. Ct. App. Dec. 8, 2015). He then applied for leave to appeal to the Michigan Supreme Court, which denied leave on May 24, 2016, because it was "not persuaded that the questions presented should be reviewed" by that court. *People v. Reed*, 878 N.W.2d 851 (Mich. 2016) (Mem.).

In October 2016, Petitioner filed his habeas corpus petition raising three grounds for relief, as follows:

I. The Prosecution failed to produce legally sufficient evidence to identify [Petitioner] as the perpetrator or prove his guilt beyond a reasonable doubt.

II. Assuming [Petitioner] was present, his convictions for three counts of first degree criminal sexual conduct and their associated counts of felony firearm should be vacated and the charges dismissed, as the prosecution failed to present legally sufficient evidence he was criminally responsible as an aider and abettor to those offenses, contrary to his constitutional right to due process of law.

III. Defense counsel was constitutionally ineffective in failing to object to the arresting officer improperly giving opinion testimony on [Petitioner's] guilt.

(Pet., ECF No. 1, PageID.8, 10-13.) Respondent has filed an answer to the petition (ECF No. 6) stating that the grounds should be denied because they are meritless. Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless. Accordingly, I recommend that the petition be denied.

**Discussion**

I.    Factual background

Petitioner and an acquaintance, James Brooks, stormed into a home where two individuals, one male and one female, were sleeping, forced them to take their clothes off, assaulted them, and left with some items belonging to the occupant of the house.

According to the female victim ("FV"), she had been with the male victim ("MV") the evening before August 13, 2013, at his home, and they fell asleep while watching television. (ECF No. 7-7, Trial Tr. II, 17.) The next thing FV remembered is being pulled off the couch by two masked men, who told her to take her clothes off. Both men were holding handguns. (*Id.* at 20, 23, 40.) She could not see their faces completely, but she remembered that one was wearing a red and black sweatshirt. At trial, she identified Petitioner as that person. (*Id.* at 19.) Petitioner and Brooks forced her and MV take their clothes off and then tied their hands behind their backs. Petitioner or Brooks struck FV on the back of the head with a gun, after which she found herself on the couch, lying face down, with her head pushed into the arm of the couch. (*Id.* at 26.) She felt Petitioner and Brooks touch her body, including her breasts. (*Id.* at 23.) When MV pleaded with Petitioner and Brooks not to hurt FV, Petitioner struck him on the back of the head. (*Id.* at 24-25.)

Later, Brooks took FV into a bedroom, put a pillow case over her head, and penetrated her with a gun and his penis. (*Id.* at 24, 29, 42.) While that was happening, Petitioner was "rummaging" through the rest of the house. (*Id.*) The next thing FV remembered is lying curled up on the bedroom floor with a paramedic nearby. (*Id.* at 31.) Someone took her to the hospital and the police interviewed her there. At the hospital, the only description she gave of the attackers is that they were wearing masks. (*Id.* at 38.) At trial, she acknowledged that the first

time she mentioned a black and red shirt was in her trial testimony, and that before she testified, she had spoken with the prosecutor, the detective, and two police officers about the case. (*Id.* at 40-41.) The police did not have her attend a lineup or show her a series of pictures in order to identify her assailants. (*Id.* at 42-43.) She had never seen Petitioner or Brooks before the night of the attack. (*Id.* at 44.) On redirect examination, the prosecutor showed FV a sweater, and FV confirmed that it was the sweater that Petitioner was wearing on the night of the offense. (*Id.* at 45.)

MV also testified. He confirmed that he was with FV on the night of the assault. (*Id.* at 50-51.) They ate dinner together and then fell asleep on the couch while watching television. He woke up to the sound of someone screaming and saw a gun next to his face. (*Id.* at 52.) Two men had broken into his house and were demanding money and drugs. (*Id.* at 75.) Both of them were wearing black ski masks. One was taller and skinnier, and the other was more heavyset. (*Id.* at 52.) Both were carrying black pistols. (*Id.* at 53.)

The two men threatened to kill MV and FV. They told MV to take his clothes off. He did so, and the two men tied his hands behind his back with a bedsheet. (*Id.* at 54.) He heard them talk about having sex with FV, and saw them touching her. When MV tried to get a better look at what was happening to FV, Petitioner struck him in the back of the head. (*Id.* at 59.)

MV was able to call 9-1-1 from his cell phone when Petitioner and Brooks were not paying attention to him. When Brooks was in the bedroom with FV, MV saw Petitioner pick up MV's television and take it outside. (*Id.* at 61.) According to MV, Petitioner also took his wallet, car keys, iPod, computer, and camera. (*Id.* at 64.)

The next thing MV remembered is a police car pulling up outside his house. Brooks ran out the back door to escape and MV ran after him. Brooks got away. When MV

returned to the house, he saw FV curled up on the floor, saying, "He raped me," or "They raped me," over and over again. (*Id.* at 65.)

The police caught Brooks and brought him back to MV's house. MV recognized him by his white Adidas shoes and his body shape. (*Id.* at 68-69.) The police also brought Petitioner to the house, sitting in the back of a police car, and MV identified him as the other assailant. (*Id.* at 69, 82.)

Sue Gatza, a nurse for Child & Family Services, examined FV on August 13. FV told her the details of what had happened. Among other things, FV stated that Brooks made FV bend over and then he "digitally penetrated" her. (ECF No. 7-8, Trial Tr. III, 9.) Gatza noted bruising on the top of MV's head, around the opening of her vagina, and on the front of her shins. (*Id.* at 10.) When asked whether Gatza thought FV's injuries could have been caused by a consensual interaction, Gatza stated that "the story [FV] gave me with the insertion of the gun or the penis was consistent with the injury that she had." (*Id.* at 11.)

Petitioner's girlfriend, Breona Martin, testified that she shared a residence with Petitioner, but they owned their own vehicles. (Trial Tr. II, 96.) She owned a white Pontiac Grand Am. He owned a Chevy Suburban. They put her license plate on his car. (*Id.* at 96.) At about 1:00 or 2:00 in the morning on August 13, 2013, Petitioner called her and asked her to pick him up from a store on the east side of Saginaw, near his mother's house. (*Id.* at 118.) She did so and then they went home. About an hour later, Petitioner received a phone call about his truck, and he asked Martin to take him to pick it up. (*Id.* at 121.) When Martin and Petitioner arrived at the location of Petitioner's truck, they saw that it was surrounded by police officers. (*Id.* at 102.) Martin turned the car around and then they were stopped and arrested. (*Id.* at 103.) She denied

5

having knowledge of a black and red hoodie. (*Id.* at 108.) She claimed that "lots of people" kept their clothes in the back of her car. (*Id.* at 109.)

Officer Russell Uphold of the Saginaw Township Police learned about the 9-1-1 call and was dispatched to MV's address. (*Id.* at 127.) As Uphold approached the house, he saw a naked female run out the front door. (*Id.* at 131.) She was screaming that she had been raped. (*Id.*) He started walking toward the woman when he saw a black male dressed in black clothing run out the back door, followed by a naked white man. (*Id.* at 131-32.) The suspect in black clothing escaped over a fence, and Uphold contacted central dispatch before turning his attention to the victims. (*Id.* at 134.) Inside MV's residence, Uphold found a magazine of unspent bullets for a .40 caliber handgun. (*Id.* at 142.) Outside the residence, on the other side of the fence that the suspect escaped over, Uphold found a .45 caliber handgun, gray sweatpants, and the sleeve of a black t-shirt with eyeholes cut out of it. (*Id.* at 142-45.) Uphold followed some tracks in the grass and found a .40 caliber handgun without a magazine. (*Id.* at 147.) While collecting this evidence, Uphold learned that other police officers had captured Brooks, who was hiding in a shed. (*Id.* at 148.)

Officer Steven Wietecha of the Saginaw Township Police was also dispatched to MV's home. (ECF No. 7-8, Trial Tr. III, 12.) As Wietecha was on his way to the scene, he came upon a suspect who was wearing a black and red sweatshirt. (*Id.* at 14.) The suspect was running through a field about a block from MV's home. (*Id.* at 17.) Officer Wietecha got out of his car to pursue the suspect on foot and then lost sight of him. Wietecha radioed for other officers to set up a perimeter and to bring a tracking dog.

Officer Wietecha assisted with tracking the suspect's movement. As he and other officers were headed south, they came across a green Chevy Suburban. Wietecha was familiar

with the neighborhood, but he did not recognize the vehicle. (*Id.* at 26.) He called in the plate number discovered that it was registered to Breona Martin. He looked inside the vehicle and saw a Bridge card and what appeared to be two dark hoodies. (*Id.* at 27.) Police later determined that the Bridge card belonged to Brooks. (*Id.* at 29.)

Wietecha continued through the neighborhood, attempting to find the suspect. As he was doing so, he saw a white vehicle drive by. The vehicle's occupants were looking around near the Chevy Suburban. He called in the plate number on this vehicle, and learned that it was also registered to Breona Martin. (*Id.* at 30.) A Michigan state trooper stopped the white vehicle. Wietecha went to the location of the white vehicle and identified the black and red sweatshirt that he saw on the suspect that he had been following. (*Id.* at 31.) Another officer had discovered the sweatshirt inside the vehicle. Wietecha observed that there were burrs on the sweatshirt that were like burrs that snagged on his pants when he was tracking the suspect on foot. (*Id.* at 32.)

Officer Michele Fleming assisted with setting up a perimeter in the search for the suspect wearing the black and red sweatshirt. She positioned herself a couple of blocks south of where he had last been seen. (*Id.* at 38-39.) As she was waiting, she saw someone come out of the brush wearing what appeared to be a black and red striped jacket. (*Id.* at 40.) She drove toward him, but he turned around and ran the other direction. Officer Fleming was one of the officers who stopped the white vehicle with the license plate registered to Breona Martin. Petitioner and Martin were in the vehicle. (*Id.* at 43.)

Fleming opened the trunk of Martin's vehicle and discovered a red and black sweatshirt. (*Id.* at 49.) Fleming picked up the sweatshirt and a white sock fell out of the sleeve. (*Id.* at 50.) When examining the sweatshirt later at the station, Fleming found the sleeve of a black t-shirt balled up inside the sweatshirt. (*Id.* at 51.)

The prosecution and defense stipulated to the admission of a report indicating that FV's DNA was on both of the handguns that were recovered near the scene of the offense. (*Id.* at 71.)

After the prosecution rested, Petitioner opted not to testify or to call any witnesses.

II.     AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34 (2011). Thus, the inquiry is limited to an examination of the

8

legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.     Sufficiency of the Evidence (habeas grounds 1 and 2)

Petitioner argues that the evidence was not sufficient to convict him, as it pertains to: (1) his identity as one of the perpetrators; and (2) his guilt and responsibility as an aider and abettor for the CSC convictions and the associated felony-firearm convictions.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "'a nearly insurmountable hurdle'" for petitioners

who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2008) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

When reviewing this claim, the Michigan Court cited *People v. Nowack*, 614 N.W.2d 78 (Mich. 2000), which incorporates the standard in *Jackson*. Thus, at a minimum, the court of appeals applied the correct standard.

### A. Identity

As to identity, the Michigan Court of Appeals determined that

> there was ample evidence regarding Reed's identity. The male victim testified that Reed had been wearing a red and black sweatshirt. Officer Wietecha testified that, as he approached the home, he saw a man in a red and black sweatshirt running away from the home. Officer Wietecha chased the man into a wooded area and lost sight of him, but he got burrs on his uniform. A tracking dog led officers to a Suburban that Reed owned. Reed was apprehended after he returned to the Suburban and, in the back of the car he was riding in, officers found a red and black sweatshirt with burrs on it. Officer Wietecha identified Reed as the man he had chased into a wooded area, and the male victim identified Reed as one of the home invaders. Viewing this evidence in the light most favorable to the prosecution, it supported the jury's finding that Reed was one of the men who participated in the crimes.

*Reed*, 2015 WL 8278760, at *2.

The state court's determination of the facts is not unreasonable, and Petitioner has given the Court no reason to believe that it is contrary to, or an unreasonable application of, the standard in *Jackson*.

### B. CSC convictions

The Michigan Court of Appeals found that the evidence was sufficient to support Petitioner's CSC convictions as an aider and abettor:

> In this case, evidence supported the jury's determination that Reed aided and abetted Brooks in sexually assaulting the female victim. Both victims testified that Reed touched the female victim's breasts and sexual areas. The male victim testified that he heard both Brooks and Reed state that they were going to sexually assault the female victim. When the male victim attempted to interfere in the sexual assault, Reed struck him in the head with his weapon. We conclude that a

11

> reasonable jury could find that Reed knew that Brooks intended to sexually assault the female victim and aided him by preventing the male victim from interfering.

*Reed*, 2015 WL 8278760, at *3.

Under Michigan law, "A person who helps another commit a crime is just as guilty of the crime as the person who directly committed it[.]" *Id.* at *3 (citing Mich. Comp. Laws § 767.39). "But a defendant's mere presence at the scene of a crime is not enough to support a conviction under an aiding and abetting theory." *Id.* The prosecution must establish that:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement.

*People v. Bennett*, 802 N.W.2d 627, 633 (Mich. Ct. App. 2010) (quoting *People v. Robinson*, 715 N.W.2d 44, 47-48 (Mich. 2006)).

Petitioner does not identify any error in the court of appeals' description of the record or its application of the law to his case. The court of appeals did not expressly identify the evidence giving rise to three CSC I convictions and one CSC II conviction, but there is sufficient evidence in the record to support all four. First-degree criminal sexual conduct occurs when there is "sexual penetration" and the actor is armed with a weapon, or the actor is aided or abetted by another person and the actor uses force or coercion to accomplish the penetration. Mich. Comp. Laws § 750.520b(d)(ii), (e). There is sufficient evidence that Brooks was armed with a gun, that he used force to accomplish four penetrations, and that Petitioner aided and abetted his conduct. The witnesses at trial testified that Brooks was armed with a gun, he threatened to kill FV, he and Petitioner tied her hands behind her back, he struck her on the back of the head, and then he penetrated her three times: once with a gun, once with his finger, and once with his penis. For the

12

reasons discussed in its opinion, the court of appeals reasonably determined that Petitioner aided and abetted Brooks' conduct.  Thus, there is sufficient evidence to support three CSC I convictions.

Second-degree criminal sexual conduct occurs when there is "sexual contact" and the actor is armed with a weapon, or the actor is aided or abetted by another person and the actor uses force or coercion to accomplish the sexual contact.  Mich. Comp. Laws § 750.520c(d)(ii), (e).  The witnesses testified that Petitioner touched FV's breasts, and that Petitioner was armed with a gun at the time.  Thus, the evidence is sufficient to demonstrate that Petitioner committed second-degree criminal sexual conduct on his own.

In addition, for the reasons indicated in the previous paragraph, there is sufficient evidence that Petitioner aided and abetted Brooks' sexual contact through the use of force or coercion.  Brooks also touched FV's breasts, after either Brooks or Petitioner struck FV on the back of the head.  The evidence that Petitioner aided and abetted Brooks' sexual penetration of FV, and engaged in sexual contact himself, is sufficient to show that Petitioner aided and abetted Brooks' sexual contact with FV.  Thus, there is sufficient evidence to support a CSC II conviction.

### C.  Felony-Firearm convictions

Petitioner contends that the evidence was not sufficient to convict him of felony-firearm, which involves carrying or possessing a firearm during the commission of a felony.  Mich. Comp. Laws § 750.227b.  The victims testified that Petitioner was carrying a firearm when he entered MV's home, tied up MV with a bedsheet, struck MV in the head, and sexually assaulted FV.  Petitioner also took MV's belongings and carried them outside.  Two guns were later found outside the home, on the ground, after Petitioner fled.  Thus, the evidence was sufficient to show that Petitioner was in possession of a firearm while committing all of the felonies inside MV's home.

In short, Petitioner's sufficiency-of-the-evidence claim is meritless.

IV.     Ineffective Assistance of Counsel (habeas ground 3)

Petitioner apparently claims that his counsel provided ineffective assistance by failing to object to the testimony of the arresting officer who gave an opinion as to Petitioner's guilt.  At least, that is how Petitioner describes his claim in his petition.  The brief that he filed on appeal, and which he has also filed in support of his claims in these proceedings, raises a claim that is somewhat different.  Although the brief describes the claim as an instance in which the "arresting officer improperly [gave] opinion testimony," (Br. in Supp. of Pet., ECF No. 9, PageID.496),  the analysis in the brief focuses on something different.  In the analysis portion of the brief, Petitioner contends that it was improper for the sexual assault nurse, Sue Gatza, to state that "the story [MV] gave me with the insertion of the gun or the penis was consistent with the injury that she had."  (*See* Trial Tr. III, 11.)  In other words, Petitioner apparently contends that his attorney should have objected to the fact that the sexual assault nurse, rather than the arresting officer, gave an improper opinion regarding Petitioner's guilt.  Indeed, the Court cannot find any instance in the record in which the arresting officer gave an opinion about Petitioner's guilt.  Thus, the Court assumes that Petitioner is claiming that his attorney should have objected to Gatza's statement.

The Michigan Court of Appeals rejected Petitioner's claim.

> To prove that his defense counsel was not effective, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v. Trakhtenberg*, 493 Mich. 38, 51–52; 826 NW2d 136 (2012).
>
> A witness may not opine about the defendant's guilt or innocence. *People v. Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013). Accordingly, an expert witness may not opine that a defendant sexually assaulted a particular victim. *People v. Peterson*, 450 Mich. 349, 374; 537 NW2d 857, amended 450 Mich. 1212 (1995). However,

14

> a sexual assault nurse examiner may testify that a victim's injuries are or are not consistent with a victim's account of how the injuries were received. See *People v. McLaughlin*, 258 Mich App 635, 657–658; 672 NW2d 860 (2003).
>
> Counsel is not ineffective for failing to make a futile challenge. *Ericksen*, 288 Mich App at 201. In this case, Sue Gatza, a sexual assault nurse examiner, testified that the victim's account to Gatza at the hospital "was consistent with the injury that she had." Gatza did not render a legal conclusion about whether a sexual assault actually occurred, and she did not state an opinion about whether Reed committed it. Accordingly, the testimony was permissible opinion testimony, and trial counsel did not render ineffective assistance by failing to challenge it. Further, it is not reasonably likely that the result of the proceeding would have been different had counsel challenged the testimony because it was admissible opinion testimony.

*Reed*, 2015 WL 8278760, at *3-4.

The court of appeals applied the correct standard for claims of ineffective assistance of counsel, which comes from *Strickland v. Washington*, 466 U.S. 668 (1984). In addition, it applied the standard correctly. The court of appeals held that Gatza's testimony was admissible. The admissibility of Gatza's testimony is an issue of state law, and the state court's determination is binding in this Court. *See Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'") (quoting *Bradshaw*, 546 U.S. at 76). If the evidence was admissible, then any objection by Petitioner's attorney would have been futile. As indicated by the court of appeals, the failure to raise a futile objection is not ineffective assistance. Accordingly, Petitioner's ineffective-assistance claim is meritless.

## **Certificate of Appealability**

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken. 28 U.S.C. § 2253(c)(1). A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district

court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists would not conclude that this Court's denial of Petitioner's claims is debatable or wrong.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

Dated:  May 7, 2018                            /s/ Ray Kent
                                               United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).